Filed 8/7/24  Marriage of Hobson CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re the Marriage of CHRISTINE AND JIMMIE DALE HOBSON. | |
| CHRISTINE HOBSON, | E080482 |
| Respondent, | (Super. Ct. No. FLRI2000906) |
| v. | OPINION |
| JIMMIE DALE HOBSON, | |
| Respondent; | |
| OLIVER LOUER et al., | |
| Claimants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.  Affirmed.

Decker Law, James D. Decker, and Griffin R. Schindler, for Claimants and Appellants.

Benedon & Serlin, Judith E. Posner, and Kian Tamaddoni, for Respondent Jimmie Dale Hobson.

1

No appearance for Respondent, Christine Hobson.

## I.

## INTRODUCTION

Appellants Oliver and Patricia Louer purchased a home (the Property) for their daughter, Christine Hobson, and her daughter.[1] The Louers initially held title to the Property and rented it to Christine. Eventually, after Christine married Jimmie Hobson, the Louers transferred title to the Property to Christine and Jimmie, as community property. When Christine and Jimmie's marriage was nearing an end, Christine unilaterally attempted to transfer title to the Property back to her parents, unbeknownst to Jimmie. After Christine filed for dissolution of her marriage, Jimmie discovered Christine had quitclaimed the Property back to the Louers. In a bifurcated court trial of the Hobsons' dissolution proceedings, joined by the Louers as interested parties, the trial court found that Christine and Jimmie retained their community property interest in the Property and that the 2019 quitclaim deed was invalid.

The Louers appeal the trial court's ruling on the bifurcated issue of ownership of the Property. The Louers contend that the trial court erred in finding that the Property belongs to Christine and Jimmie as community property. The Louers argue that the Hobsons never acquired an interest in the Property because the 2016 quitclaim deed transferring title of the Property from the Louers to the Hobsons was invalid. The Louers

---

[1] When referring individually to parties or witnesses who share the same last names, we refer to them by their first names to avoid confusion. Our use of first names is not intended as a sign of disrespect.

2

alternatively argue that, even if title to the Property was transferred to the Hobsons in 2016, Christine transferred the Property back to the Louers in 2019, by quitclaim deed.

We conclude the Louers' arguments lack merit, and affirm the trial court's findings and ruling that the Hobsons are the legal owners of the Property.

II.

FACTS AND PROCEDURAL BACKGROUND

In 1995, the Louers purchased the Property, located in Riverside. Christine, her daughter, and Christine's boyfriend, Chris Bragg, moved into the Property right after the Louers purchased it. The Louers bought the Property so that Christine and her daughter would not have to live in an apartment.

Christine paid the Louers rent from the time after she moved into the Property until she filed for divorce from Chris. Christine married Chris in 1998, and they divorced in 2000. Christine and Chris paid the Louers $600 a month for rent and paid the electricity bill. The Louers paid the Property insurance, property taxes, and other utilities, such as water and trash.

Christine and her daughter remained at the Property after her divorce from Chris. Christine continued to pay the Louers rent, which eventually was reduced to $200 a month because she lost her job. In 2003, the Louers paid off the Property mortgage.

Jimmie began living with Christine at the Property in 2003, and they married in 2004. When Jimmie moved in, he and Christine paid the Louers $675 in monthly rent from their joint bank account, and paid for the gas, water, and electricity. The Louers

3

continued to pay the property taxes, insurance, and other household expenses and utilities.

On September 12, 2006, the Louers executed the Oliver G. Louer and Patricia A. Louer Revocable Living Trust (Louer Trust). The Louers were designated trustees, grantors, and beneficiaries of the Louer Trust, and Christine was named successor trustee and primary beneficiary upon the death of the Louers. Oliver testified that it was his intent that Christine would receive sole title to the Property when the Louers died.

On September 18, 2006, the Louers executed a quitclaim deed, which Oliver drafted, transferring title to the Property from the Louers individually, to the Louers as trustees of the 2006 Trust. Oliver believed that, as trustees, the Louers were in charge of managing the Property. Oliver testified that his intent when he drafted the quitclaim deed was to prevent the Property from entering probate upon his death.

On April 30, 2016, the Hobsons executed the Christine Marie Hobson and Jimmie Dale Hobson Revocable Living Trust (Hobson Trust), which Oliver drafted. Christine and Jimmie were named as co-trustees, grantors, and beneficiaries of the Hobson Trust. The Hobson Trust states in the declaration of trust instructions that Christine and Jimmie, as trustees, "[e]ither alone may act for or represent the trust in any transaction." The Hobson Trust further provides that, upon Christine's or Jimmie's death, the survivor must distribute the deceased spouse's share of the property in Schedule A, which consists solely of the Property. The Hobson Trust's declaration of trust states in Part 4, entitled "Character of Trust Property," that either Christine or Jimmie, as grantors, "may revoke

4

this trust at any time, without notifying any beneficiary" and "distribute the trust property listed on Schedule A" "to the grantors as their community property." Amending the Hobson Trust, however, required both grantors "acting together."

Under the Hobson Trust section entitled, "Part 8. Trustee's Management Powers and Duties," the trust states: "*A. Powers Under State Law*, [¶] The trustee shall have all authority and powers allowed or conferred on a trustee under California law, subject to the trustee's fiduciary duty to the grantors and the beneficiaries. [¶] *B. Specified Powers*, [¶] The trustee's powers include, but are not limited to: [¶] 1. The power to sell trust property, and to borrow money and to encumber trust property, including trust real estate, by mortgage, deed of trust or other method." Schedule A of the Hobson Trust only lists the Property as "Shared Property Placed in Trust." Schedule B of the Hobson Trust states: "Christine Marie Hobson's Separate Property Placed in Trust, [¶] No schedule property."

Oliver testified he included in the Hobson Trust the language that either Christine or Jimmie could act individually on behalf of the other under the Hobson Trust, in the event there was some unforeseen event. Christine testified that she believed she owned the Property and she was going to live there forever and raise her children there.

On May 9, 2016, the Louers executed a quitclaim deed, drafted by Oliver (2016 quitclaim deed), transferring title to the Property from the Louers as trustees of the Louer Trust, to Christine and Jimmie, as trustees of the Hobson Trust. The deed was signed by

the Louers and recorded a few days later.  The Louers did not receive any money in exchange for the transfer.

Oliver testified that it was his understanding that he and his wife transferred title to the Property into the Hobson Trust, which then became the owner of the Property.  Oliver further testified that he did not draft a deed transferring title only to Christine because, at that time, her "marriage seemed to be pretty strong, and we had no idea that anything like a divorce would ever happen."  Oliver did not require compensation for the Property, but stated he did not intend it to be a gift.  Rather, he intended that at his death it would become Christine's property.  Oliver testified he did not intend that the 2016 quitclaim deed would give the Hobsons a community property interest in the Property.  Instead, he intended that the Hobson Trust would own the Property.

After the Louers transferred the Property to the Hobson Trust in 2016, the Hobsons stopped paying the Louers rent and began paying the Property costs and expenses, including property taxes, homeowners' insurance, earthquake insurance, and utilities.  The Hobsons did not pay rent for the Property from April 2016 through March 2019.

During their marriage, the Hobsons used their tax refund funds in their joint bank account to pay for improvements to the Property.  Jimmie testified that he and Christine believed they owned the Property and could do whatever they wanted to it without the Louers' consent.  Jimmie believed the Louers gave the Property to both of them by transferring title to the Hobson Trust.  But Christine testified that during their fights,

6

Jimmie would say that the Property was never going to belong to him, Christine had everything, and he had nothing.

On March 25, 2019, Christine, as trustee of the Hobson Trust, executed a quitclaim deed (2019 quitclaim deed), transferring title to the Property back to the Louers Trust. The 2019 quitclaim deed was recorded. Although Oliver was not an attorney, he suggested to Christine transferring the Property back to the Louers and prepared the quitclaim deed. He wanted the Property returned because Christine told him her marriage was ending. Upon reviewing the Hobson Trust, Oliver believed Christine could unilaterally transfer title back to the Louers without Jimmie's consent. Christine also executed a claim for reassessment exclusion for transfer between parent and child. Jimmie was not mentioned on the form as one of the transferors of the Property. Both documents were only signed by Christine.

On November 4, 2019, the Louers executed an amendment to their 2006 Louer Trust, deleting Schedule A to the Louer Trust and replacing it with a new Schedule A dated November 1, 2019, which listed the Property again as a trust asset. The amendment also removed Christine as the Louer Trust successor trustee.

After Christine executed the 2019 quitclaim deed, Oliver drafted a rental agreement, which Christine signed, and she began paying the Louers rent. The Louers resumed paying the homeowners' insurance and property taxes. Oliver told Jimmie about the transfer and asked him to sign the rental agreement. Jimmie refused to sign it or pay rent. On January 8, 2020, Oliver served Jimmie with a three-day notice to quit.

7

Jimmie moved out in January or February 2020, and Christine continued paying the rent to the Louers. Jimmie testified he did not learn of Christine's purported transfer of the Property to the Louers until after Christine filed for divorce in February 2020.

On December 11, 2020, Jimmie filed a joinder complaint to the dissolution petition. His joinder complaint included a cause of action to cancel the 2019 quitclaim deed and a request for declaratory and injunctive relief.

On February 8, 2021, the Louers filed a cross-complaint on Jimmie's joinder action, which included causes of action for quiet title and cancellation of the 2016 quitclaim deed.

On September 14th-16th, 2022, the court tried the Property ownership issues. The trial court issued a written statement of decision on November 16, 2022, in which the court made the following findings regarding the Property: (1) The Property was presumptively community property acquired by the Hobsons during their marriage; (2) in 2016, the Louers transferred title to the Property from the Louer Trust to the Hobson Trust; (3) in 2016, the Louers intended to convey all interest in the Property to both Christine and Jimmie, as trustees of the Hobson Trust; (4) as trustees, Christine and Jimmie jointly held legal title to the Property based upon the 2016 quitclaim deed; and (5) after the Louers transferred Property title in 2016 to the Hobson Trust, the Hobsons no longer were required to pay the Louers rent, and were responsible for paying for the Property taxes, insurance, maintenance, and improvements.

The trial court further found regarding Christine's attempt to transfer the Hobsons' interest in the Property back to the Louers: (1) under Family Code section 761, subdivision (a),[2] modification of the rights and interests in the Property held in the Hobson Trust required joinder or consent of both spouses; (2) Christine's attempted unilateral transfer of the Property to the Louers by executing the 2019 quitclaim deed was tantamount to an amendment of the Hobson Trust; (3) Christine's attempted return of the Property to the Louers was not valid under the terms of the Hobson Trust because it was done unilaterally by Christine, and was tantamount to a revocation of the Hobson Trust; (4) because Christine's attempted unilateral transfer of the Property was invalid, the Property remained community property under section 761, subdivision (b); (5) because the 2019 quitclaim deed was invalid, title to the Property remained in Christine's and Jimmie's names, as trustees of the Hobson Trust; (6) Christine did not provide any evidence rebutting the community property presumption and did not establish that the Property was her separate property, not community property; (7) Christine's and the Louers' concealed efforts to attempt to convey the Property back to the Louers did not change the community property character of the Property; and (8) Christine is not liable to Jimmie for breach of fiduciary duty by attempting to unilaterally transfer title to the Property back to the Louer Trust, because she reasonably relied upon Oliver's assurances and the Hobson Trust language, and held a good faith belief the Louers became the owners of the Property.

---

[2] Unless otherwise noted, all statutory references are to the Family Code.

9

In the statement of decision, the trial court ordered that (1) the Property be characterized as the Hobsons' community property and (2) the Louers immediately transfer title to the Property back to the Hobsons as tenants in common. The Louers filed a notice of appeal of the statement of decision findings and orders entered on November 16, 2022.

III.

VALIDITY OF THE 2016 QUITCLAIM DEED

The Louers contend the Hobsons never acquired an interest in the Property because the 2016 quitclaim deed was invalid. We disagree.

The trial court found that, when the Louers executed the 2016 quitclaim deed, the Louers intended to convey the Property to both Christine and Jimmie. The Louers argue substantial evidence does not support this finding, and that the evidence establishes that the Louers instead intended that Christine would inherit the Property after the Louers died. The Louers maintain that the 2016 quitclaim deed was therefore invalid because the Louers never intended (1) to divest themselves of title to the Property when they executed the 2016 quitclaim deed or (2) to transfer any interest in the Property to Jimmie.

"'A deed delivered with the intent that it shall take effect only on the death of the grantor is an attempted testamentary disposition and therefore *void*. [Citation.]'" (*Meyer v. Wall* (1969) 270 Cal.App.2d 24, 27, italics added.) "'"[T]o constitute a valid delivery there must exist a mutual intention on the part of the parties, and particularly on the part of the grantor, to pass title to the property immediately. In other words, to be a valid

10

delivery, the instrument must be meant by the grantor to be presently operative as a deed, that is, there must be the intent on the part of the grantor to divest himself presently of the title. Even if the document is manually delivered, but the evidence shows that the parties or the grantor intended the document to become operative only upon death, the document is testamentary in character and void as a deed." [Citation.]'" (*Ibid.*, italics added; see also *Blackburn v. Drake* (1963) 211 Cal.App.2d 806, 811-812; *Henneberry v. Henneberry* (1958) 164 Cal.App.2d 125, 129; Miller & Starr, Cal. Real Estate (3rd ed. 2000) § 8:38, p. 74 ["Any attempt to convey property by a deed that is to become effective only on the grantor's death is completely ineffective and void."].)

The intent to pass title, an essential element of delivery, is a question of fact which must be determined by the trier of fact upon consideration of all of the circumstances surrounding the transaction. (*Meyer v. Wall*, *supra*, 270 Cal.App.2d at p. 27.)

Here, there is substantial evidence supporting the trial court's finding that the Louers intended to divest themselves presently of title to the Property when they executed the 2016 quitclaim deed transferring title to the Property to the Hobsons through the Hobson Trust. There is evidence establishing that in 2016, Oliver drafted the Hobson Trust and the 2016 quitclaim deed transferring title to the Property to the Hobsons, through the Hobson Trust. Thereafter, the Hobsons stopped paying the Louers rent for the Property, and began paying for all of the Property expenses, including property taxes, insurance, utilities, maintenance, and improvements. Before execution of the 2016 quitclaim deed, most of those expenses were paid by the Louers, and the Hobsons paid

the Louers rent while living at the Property. Oliver told the Hobsons they no longer had to pay rent after execution of the 2016 quitclaim deed. Christine and Jimmie testified they believed that after the Louers quitclaimed the Property to them in 2016, they became the sole, joint owners of the Property.

The Louers argue that the absence of any consideration for the transfer of the Property to the Hobsons supports a finding that the Louers did not intend to convey the Property to the Hobsons when they executed the 2016 quitclaim deed. "Neither consideration, nor adequacy of consideration, is essential to the validity of a deed." (*Odone v. Marzocchi* (1949) 34 Cal.2d 431, 436.) While lack of consideration may be relevant when determining whether there was intent, here the lack of consideration is insufficient to establish a finding of a lack of intent to transfer the Property to the Hobsons, because there is other strong evidence that the Louers intended to voluntarily transfer title without requiring the Hobsons to provide anything in return.

For instance, Oliver testified that the Louers decided to quitclaim the Property to the Hobsons because the Hobsons' marriage seemed to be strong and stable, the Louers wanted the Hobsons to benefit from the homestead property tax deduction, and the Louers wanted to ensure that Christine and her children could live in a house instead of an apartment. It was not until Christine told the Louers that her marriage was ending that the Louers realized that they needed to regain title of the Property to avoid Jimmie retaining an interest in the Property. Oliver persuaded Christine in 2019 to surreptitiously, without Jimmie's knowledge or consent, attempt to transfer title to the

12

Property back to the Louers. Had the Louers intended, as they argue, to retain title to the Property until after they both passed, rather than transferring title in 2016, by quitclaim deed to both Christine and Jimmie, the Louers could have simply retained title to the Property in their living trust, which provided for transfer of title to the Property to Christine upon their death. These facts establish that the parties understood that the Louers' transferred title to the Property to both Christine and Jimmie by executing the 2016 quitclaim deed.

We conclude based on the totality of the evidence that there was substantial evidence that the Louers intended to pass present title to the Property to the Hobsons by executing the 2016 quitclaim deed, which was thus valid and immediately transferred title to Christine and Jimmie in 2016.

IV.

INVALIDITY OF THE 2019 QUITCLAIM DEED

The Louers contend that even assuming they transferred title to the Property in 2016 to the Hobsons, Christine transferred title to the Property back to the Louers in 2019, by executing and recording the 2019 quitclaim deed. The Louers argue the trial court erred in finding invalid Christine's unilateral transfer of title to the Louers in 2019. Jimmie argues the Louers forfeited this objection by misrepresenting the record on appeal and by failing to address the bases for the trial court's decision. Regardless of whether the Louers forfeited their objection, we reject it on the merits.

13

The trial court found that, as a result of the 2016 quitclaim deed transferring title to the Hobsons, the Hobsons thereafter jointly held title to the Property as community property. The trial court further found that Christine's surreptitious attempt to reconvey the Hobsons' title back to the Louers, without informing Jimmie or obtaining his consent, was ineffective and did not eliminate the Hobsons' community property interest in the Property. The trial court therefore ordered the Louers to immediately effectuate record title of the Property by the Hobsons.

In determining whether the Hobsons' interest in the Property was lawfully quitclaimed to the Louers by the 2019 quitclaim deed, we begin by determining the character of the Hobsons' interest in the Property in 2019, and whether Christine could legally unilaterally transfer title to the Property to the Louers.

A. *Characterization of the Property as Community Property*

"The characterization of property as community or separate can be determined by the date of acquisition, the application and operations of presumptions, or by whether the spouses have transmuted the property. [Citation.] . . . The party claiming that property acquired during the marriage, which is presumed to be community property, is actually separate property has the burden of overcoming this presumption by a preponderance of the evidence. [Citation.]" (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526; § 760 ["Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."].) The Hobsons were married when the

14

Louers transferred title to Christine and Jimmie in 2016.  The presumption is thus that the Property was community property.  The Louers had the burden of proving otherwise, and failed to do so, as discussed in the preceding section.

Furthermore, substantial evidence supports the trial court's finding that the Property was the Hobsons' community property when Christine attempted to transfer title to the Louers by executing the 2019 quitclaim deed.  The parties' trial testimony and documentary evidence established the character of the Property as community property.  In 2016, the Louers quitclaimed the Property to both Christine and Jimmie, as trustees of the Hobson Trust.  Schedule A attached to the 2016 Hobson Trust states that the Property is "Shared Property Placed in Trust."  The Hobson Trust's declaration of trust states in Part 4, entitled "Character of Trust Property," that either Christine or Jimmie, as grantors, may revoke the Hobson Trust at any time and "distribute the trust property listed on Schedule A" "to the grantors [Christine and Jimmie] as their community property."

B. *Invalidity of Christine's Unilateral Attempt to Transfer Title in 2019*

The Louers argue that, regardless of whether the Property was community property, the 2019 quitclaim deed was valid.  We disagree.

Christine, as trustee of the Hobson Trust, unilaterally executed the 2019 quitclaim deed in an attempt to transfer the Hobsons' interest in the Property to the Louers.  This was done without Jimmie's consent or knowledge and was intended to eliminate the Hobsons' title to the Property.  Had the 2019 quitclaim been valid, it would have removed the sole asset in the Hobson Trust, which would have had the effect of revoking

15

the Hobson Trust. (*Estate of Coleman* (2005) 129 Cal.App.4th 380, 388 ["Where the property of the trust ceases to exist, there is nothing to which the trustee may hold legal title, nothing in which the beneficiaries may hold a beneficial interest, and there is no longer a trust. [Citation.][] It follows that the complete withdrawal of the trust property terminates the entire trust." (fn. omitted.)].) Under the Hobson Trust, revocation of the trust by removing the only property held within it required distribution of the Property to the trust's grantors (Christine and Jimmie) as their community property. As community property, Christine could not transfer Jimmie's interest in the Property to the Louers. (§ 761, subd. (a).)

The Louers argue that Christine had authority under the Hobson Trust to unilaterally transfer the Property to the Louers, without Jimmie's consent or knowledge, because section 761, subdivision (c) and the Hobson Trust provide that, when property is held in a trust, a trustee spouse is authorized to unilaterally, without the consent of the other trustee spouse, convey and otherwise manage and control trust property in accordance with the provisions of the trust, "unless the trust expressly requires the joinder or consent of one or both spouses." (§ 761, subd. (c).)

Under section 761, subdivision (a), "[u]nless the trust instrument or the instrument of transfer expressly provides otherwise, community property that is transferred in trust remains community property during the marriage, regardless of the identity of the trustee, if the trust, originally or as amended before or after the transfer, provides that the trust is revocable as to that property during the marriage and the power, if any, to modify the

16

trust as to the rights and interests in that property during the marriage may be exercised only with the joinder or consent of both spouses."

The Hobson Trust states that either Christine or Jimmie, as trust grantors, can revoke the Hobson Trust in writing or by any manner allowed by law. The Hobson Trust further states that the grantors can amend the trust "only by both of them acting together," and "[a]ll amendments must be in writing and signed by both grantors." Under these provisions, Christine could unilaterally revoke the Hobson Trust, but any amendment to the Hobson Trust required both Christine and Jimmie to do so in writing, signed by both of them.

The Hobson Trust expressly required the joinder or consent of Jimmie when Christine gratuitously transferred title to the only property held in the Hobson Trust. Regardless of whether the removal of the Property from the Hobson Trust amended, modified, or revoked the Hobson Trust, Christine's unilateral transfer of title to the Property was invalid because she removed the Property from the Hobson Trust without Jimmie's consent and, more significantly, gratuitously transferred both Jimmie's and her community property interest in the Property to the Louers without Jimmie's consent. This removal of the Property from the Hobson Trust and transfer of title to the Louers was tantamount to a trust revocation, which in accordance with the declaration of trust, Part 4, required distribution of the Property to Christine and Jimmie as their community property. The 2019 quitclaim transfer of title to the Louers thus violated the Hobson

17

Trust by transferring title to the Louers, instead of to the Hobsons as community property.

Under section 761, subdivision (b), "Unless the trust instrument expressly provides otherwise, a power to revoke as to community property may be exercised by either spouse acting alone. Community property, including any income or appreciation, that is distributed or withdrawn from a trust by revocation, power of withdrawal, or otherwise, remains community property unless there is a valid transmutation of the property at the time of distribution or withdrawal."

Although under this provision Christine could unilaterally revoke the trust by removing the sole Property from the Hobson Trust, the Hobson Trust declaration of trust provides, consistent with section 761, subdivision (b), that "If the trust is revoked, the trustee shall distribute the trust property listed on Schedule A to the grantors as their community property." Christine and Jimmie were the trustees and grantors. Upon revoking and or amending the Hobson Trust, Christine was required to distribute the Property, which was community property, to herself and Jimmie. Christine, however, executed the 2019 quitclaim deed in an attempt to transfer title from the Hobson Trust to the Louers. The 2019 quitclaim deed was therefore invalid and in violation of the terms of the Hobson Trust.

C. *The Trial Court Finding that the 2019 Quitclaim Deed Is Invalid*

The Louers argue that the trial court did not expressly find or order that the 2019 quitclaim deed was invalid. Therefore, it must be assumed the 2019 quitclaim deed is

18

valid. We disagree. It can be reasonably inferred from the trial court's statement of decision that the trial court found that the 2019 quitclaim deed was invalid. The court was not required to make a specific finding in this regard, particularly when the Louers did not request it or object to the statement of decision on the ground there was no such express finding. (*Runyan v. Pacific Air Industries, Inc.* (1970) 2 Cal.3d 304, 309-310 ["'[W]hile full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made.'"]; see also *St. Julian v. Financial Indemnity Co.* (1969) 273 Cal.App.2d 185, 195; *Kuffel v. Seaside Oil Co.* (1977) 69 Cal.App.3d 555, 565; 59 Cal. Jur. 3d Trial § 181.)

It can be implied from the following findings in the statement of decision that the trial court found that the 2019 quitclaim deed was invalid. The trial court found that Christine unilaterally attempted to reconvey the Property to the Louers by executing the 2019 quitclaim deed. The trial court further found that in 2019, Christine and the Louers "concealed efforts to convey" the Hobsons' interest in the Property to the Louers. The trial court found that this surreptitious attempt to unilaterally transfer title to the Louers by executing the 2019 quitclaim deed did not change the community property character of the Property, and the Hobsons continued to hold title to the Property. Therefore, in effect, the 2019 quitclaim deed was invalid, resulting in the trial court ordering that the Property remain characterized as the Hobsons' community property.

19

In addition, the trial court found that Christine's attempted "unilateral transfer of the [Property] to [the Louers] is tantamount to an amendment of the Hobson Trust"; Christine's "amendment to the Hobson Trust is not valid, pursuant to the express terms of the Hobson Trust"; Christine's "unilateral transfer of the [Property] to [the Louers] is tantamount to a revocation of the Hobson Trust"; and "pursuant to [section] 761 [subdivision] (b) [the Property] remains community property despite [Christine's] unilateral distribution and withdrawal of the [the Property] from the Hobson Trust."

Even if not expressly stated, the trial court's findings and orders were well-founded and more than sufficient in pronouncing the 2019 quitclaim deed invalid.

D. *Order that the Louers Transfer Title Back to the Hobsons*

The Louers argue that the trial court's order "to immediately effectuate a transfer of title" to the Property to the Hobsons "as tenants in common, forthwith," demonstrates that the trial court found that the 2019 quitclaim deed was a valid conveyance of the Property to the Louers. The Louers assert that, if it were not a valid transfer, there would be no need for the trial court to order the Louers to transfer title to the Property back to the Hobsons. We disagree.

The trial court's order that the Louers effectuate return of title of the Property to the Hobsons was appropriate and not inconsistent with the determination that the 2019 quitclaim deed was invalid. The trial court reasonably ordered the Louers to effectuate transfer of the Property title back to the Hobsons because Christine recorded the 2019 quitclaim deed, which clouded the Hobsons' title to the Property. The trial court's order

20

merely required the Louers to clear title by quitclaiming any interest in the Property, which the Louers might later on claim under the 2019 quitclaim deed.

The order also required the Louers to convey title to the Hobsons as tenants in common, rather than as community property, apparently because the matter was part of ongoing dissolution proceedings. (§§ 2550, 2553 ["The court may make any orders the court considers necessary to carry out the purposes of this [Family Code, property] division"]; *In re Marriage of Sivyer-Foley & Foley*, *supra*, 189 Cal.App.4th at p. 525 ["Absent an agreement by the parties, . . . section 2550[] imposes on the trial court in marital dissolution proceedings a duty to value and divide equally the parties' community property estate." (fn. omitted.)].)

Thus, the trial court's order that the Louers immediately effectuate a transfer of title to the Property to the Hobsons is consistent with the trial court's other findings and does not establish, as the Louers argue, that the 2019 quitclaim deed lawfully conveyed title to the Property to the Louers.

E. *Statute of Limitations*

The Louers argue that an unauthorized transfer of community property by one spouse, without the consent of the other, is voidable, not void. Such a conveyance therefore is valid until the nonconsenting spouse brings a successful action to invalidate the unilateral transfer of community property within one year of recording title. (§ 1102, subd. (d).)

21

Here, the 2019 quitclaim deed was recorded on March 25, 2019. Jimmie did not file his joinder complaint to cancel the 2019 quitclaim deed until June 1, 2020. The Louers argue that, regardless of whether the 2019 quitclaim deed is valid, the trial court erred in ordering the Louers to transfer title back to the Hobsons, because Jimmie's complaint to cancel the 2019 quitclaim deed was barred by the one-year statute of limitations under section 1102, subdivision (d). We disagree.

First, section 1102, subdivision (d) provides that an action "to avoid an instrument mentioned in this section, affecting any *property standing of record in the name of either spouse alone*, executed by the spouse alone, shall not be commenced after the expiration of one year from the filing for record of that instrument in the recorder's office . . . ." (Italics added.) Section 1102, subdivision (d) is inapplicable by its own terms because it applies only to recorded instruments affecting title to property standing of record in the name of one spouse alone. The evidence is uncontroverted that when Christine executed the 2019 quitclaim deed, title to the Property stood in the names of both spouses as community property. Thus, the one-year statute of limitations is not a valid defense to Jimmie's action seeking to cancel the 2019 quitclaim deed.

Second, although a deed to community real property transferred to a third party is presumed valid if the person receives the deed "in good faith without knowledge of the marriage relation" (§ 1102, subd. (c)(2)), here, the Louers did not receive the 2019 quitclaim deed "in good faith without knowledge of the marriage relation" of the Hobsons, given they knew Christine and Jimmie were married at all relevant times and

22

held joint ownership of the Property when Christine attempted to unilaterally transfer their title to the Louers. (*Ibid*.)

We therefore conclude the 2019 quitclaim deed was invalid and the trial court did not err in ordering the Louers to immediately effectuate recorded title to the Property by the Hobsons as tenants in common.

V.

DISPOSITION

The judgment is affirmed. Jimmie is awarded his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:

RAPHAEL
J.

MENETREZ
J.

23